UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUNOCO PARTNERS MARKETING
& TERMINALS L.P.,

              Plaintiff,

                                       Case No. 05-74742

v.

                                       Hon. Nancy G. Edmunds

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and,
THOMAS V. SKINNER, Regional
Administrator of U.S. Environmental
Protection Agency, Region 5,

              Defendants,

and

Environmental Disposal Systems, Inc.

              Intervenor.

_____/


**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

       This matter is before the Court on Plaintiff's motion for preliminary injunction.  For

the reasons stated below, Plaintiff's motion is DENIED.

**I.  FINDINGS OF FACT**

       The current challenge by Sunoco Partners Marketing & Terminals, L.P.

("Sunoco") seeks to invalidate a federal exemption issued by the United States

Environmental Protection Agency ("EPA") to Environmental Disposal Systems, Inc.

("EDS") in March 2004.  Because there is no dispute that a preliminary injunction

enjoining the effectiveness of this exemption would result in the closure of EDS's fully

constructed facility, the Court will first set forth the background and status of EDS's project.  The Court will then address the federal exemption at issue here and Sunoco's planned project.

### A.    OVERVIEW OF EDS'S WASTE DISPOSAL FACILITY

EDS's waste disposal project consists of fully permitted and constructed injection wells, as well as a fully permitted and constructed waste treatment facility, located on its property at Citrin Drive in Romulus, Michigan.  (Declaration of Douglas F. Wicklund, ¶¶ 3-4, (Attachment 3 to EPA Memorandum in Opposition (hereinafter "EPA Memo")).

EDS has expended substantial efforts over the past ten years to construct its deep injection wells and hazardous waste facility, at a cost to EDS and its primary investor, The Policemen & Firemen Retirement System of the City of Detroit ("Police & Fire"), of approximately $40,000,000.  (Wicklund Decl., ¶ 12-13).  EDS has complied with every federal, state and local requirement, has received all of the necessary permits, has fully constructed and staffed its facility and has begun operations.  (Id., ¶ 11).

EDS's facility can inject hazardous wastes 4,000 feet below the surface into a porous strata, known as the Mt. Simon Formation.  (EPA Responses to Comments at 27-28 of 134 (Exhibit B to EDS's Initial Brief in Opposition (hereinafter "EDS Brief"))).[1] Although technically labeled "hazardous," the wastes received by the facility consist primarily of water, making the waste an ideal material for disposal by deep well injection.  (July 10, 2002, Correspondence from Russell J. Harding (Exhibit A to EDS Brief)).  The facility is prohibited from accepting flammables, ignitables, explosives,

---

[1] EPA Responses to Comments are published on EPA's website at *http://www.epa.gov/region5/water/uic/pubpdf/eds_rtc.pdf* (visited on December 26, 2005).

radioactives, regulated pesticides or herbicides, reactives, regulated PCBs, poisonous gases, poisons, medical wastes or concentrated chemicals. (EPA Responses to Comments at 77 of 134).

EDS selected the Mt. Simon formation because it is a porous strata with a proven ability to take the waste and confine it by the many layers of impermeable rock lying above the disposal zone. (Exhibit A to EDS Brief; EPA Responses to Comments at 41-42 of 134). Because of these unique geological characteristics, EPA and the Michigan Department of Environmental Quality ("MDEQ") have authorized EDS and other commercial entities to inject hazardous waste into this geologic formation. (EPA Responses to Comments at 12, 41-42; Exhibit 1 to EDS Proposed Findings of Fact and Conclusions of Law, June 1, 2001, Correspondence From Harold R. Fitch); In re Environmental Disposal Sys., Inc., Appeal Nos. UIC 04-04/04-02 (EAB 2005) (published at *http://yosemite.epa.gov/oa/EAB_Web_Docket.nsf/UIC~Decisions/ 83E9B92D3AFCBC9D85257074006CCC85/$File/EDS.pdf)* (hereinafter "EAB UIC Opinion"). The MDEQ Director has recognized this Formation's unique suitability for waste disposal. (Exhibit A to EDS Brief).

Indeed, EPA has stated that "[d]isposal of hazardous wastes through deep well injection is a safe and proven technology as long as the disposal is being performed in accordance with the applicable UIC regulations." (Exhibit 2 to EDS Proposed Findings of Fact and Conclusions of Law, Responses to Comments at 91 of 134). As such, EPA has found the Mt. Simon "structure to be geologically suited for use as a hazardous waste disposal site in a number of discrete locations in the Great Lakes region[;]"

authorizing several waste disposal facilities in the Mt. Simon formation.  EAB UIC Opinion at 10.

In contrast to this well-established use of the Mt. Simon formation, no entity in Michigan, including Sunoco, has ever used the Mt. Simon formation for a project involving brine extraction.  (Exhibit 1 to EDS Proposed Findings of Fact and Conclusions of Law).

**B.     EDS's Successful Completion of the Extensive Permitting Process**

EDS started the permitting process for its current facility in 1996, by applying to the MDEQ for deep well construction permits under Part 625 of  Michigan's Natural Resources and Environmental Protection Act ("NREPA") and a hazardous waste facility construction permit under Part 111 of NREPA.  (*See* Wicklund Decl., ¶ 4).  On March 29, 1999, MDEQ issued EDS two construction permits under Part 625.  (*Id.*, ¶ 11). These Part 625 permits authorized EDS to construct two deep injection wells (one primary well and one auxiliary well) more than 4,000 feet deep.  (*Id.*).

Sunoco never filed or voiced any objections during the MDEQ's permitting process relating to EDS's attempt to obtain these deep injection well permits.

On February 22, 2001, MDEQ issued EDS a hazardous waste management construction permit under Part 111 of NREPA to construct a hazardous waste disposal facility.  (Wicklund Decl., ¶ 5).  Again, Sunoco never filed or voiced any objections during the MDEQ's permitting process relating to EDS's attempt to obtain a hazardous waste facility construction permit.  (*Id.*).

Pursuant to its Part 625 and Part 111 construction permits, by the Fall of 2002 EDS had lawfully constructed the deep wells and facility. (*Id.*, ¶ 4-5). The deep injection wells and waste facility are now fully functional and operational. (*Id.*).

EDS's facility has also passed through a number of other federal, state, and local permitting processes, which have taken years and cost millions of dollars. (*Id.*, ¶ 11). In addition to the permits described above, EDS has obtained the following federal, state, and local permits: U.S. EPA Underground Injection Control ("UIC") Permits to construct the deep wells; MDEQ permit to discharge storm water to Godfrey Drain; MDEQ approval for storage for combustible liquids; Wayne County Department of Public Services drain permit; Wayne County Department of Environment air permits; City of Romulus soil erosion and sedimentation control permit; MDEQ wetlands permit. (*Id.*, ¶ 7).

On December 27, 2005, MDEQ issued an Operating License to EDS under Part 111 of NREPA, thereby allowing EDS to commence operations of its hazardous waste disposal facility. EDS has committed to a number of customers that EDS will dispose of their hazardous waste at EDS's facility, once the facility became operational upon issuance of the Operating License. (Wicklund Decl., ¶16). Now that the facility is in fact operating, EDS is taking the necessary steps to live up to these commitments and to receive, treat and inject hazardous waste in accordance with its federal and state authorizations. (*Id.*).

### C.    CHALLENGES TO EDS'S FACILITY

Over the past seven years, EDS's waste disposal facility has been thoroughly scrutinized by a number of courts and administrative review boards. In each of these instances, EDS's project has been approved and allowed to proceed.

EDS successfully defended a challenge to EDS' project based on city zoning regulations. *City of Romulus v. Environmental Disposal Systems, Inc.*, No. 207850, 1999 WL 33434993 (Mich. Ct. App. Oct. 15, 1999).

EDS successfully challenged MDEQ's denial of the Part 625 permits. *Environmental Disposal Sys., Inc. v MDEQ*, No. 98-87966-AA (Ingham County 1998).

EDS's Underground Injection Control Permits were upheld after a challenge. *In the Matter of Environmental Disposal Sys., Inc.*, Appeal Nos. UIS 98-1/98-2 (EAB 1998).

EDS's Part 625 injection well permits were upheld after a challenge. *Environmental Disposal Sys., Inc. v. MDEQ*, No. 99-89821-AA (Ingham County 1999).

EDS's wetland permit was upheld after a challenge. *In re Part 303 Wetland Protection of NREPA*, No. 00-82-0015-P (2000).

The renewal of EDS's Underground Injection Control Permits were upheld after a challenge by Sunoco. *In re Environmental Disposal Sys., Inc.,* Appeal Nos. UIC 04-01/04-02 (EAB 2005).

MDEQ's issuance of EDS's Part 111 permit was upheld after a challenge. *City of Romulus v. MDEQ,* Nos. 01-108700-AV, 01-110215-CE (Wayne County 2001), *aff'd*, 678 N.W.2d 444 (Mich. Ct. App. 2003), *lv. denied*, 685 N.W.2d 665 (Mich. 2004)

EDS successfully challenged Sunoco's permit to extract brine from the Mt. Simon Formation. *Environmental Disposal Sys., Inc. v Fitch*, Nos. 256661, 256820, 2005 WL 2864240 (Mich. Ct. App. Nov. 1, 2005).

### D.      EPA LAND BAN EXEMPTION ISSUED TO EDS IN MARCH 2004

On January 2, 2000, pursuant to 40 C.F.R. § 148.20, EDS filed a petition with EPA requesting an exemption from the Resource Conservation and Recovery Act's ("RCRA") land disposal restrictions for deep injection of hazardous waste through EDS's two deep injection wells.  The petition was amended several times thereafter. Underground Injection Control Program Hazardous Waste Disposal Injection Restrictions Petition for Exemption – Class I Hazardous Waste Injection Environmental Disposal Systems, Inc., Romulus, MI, 69 Fed. Reg. 15328, 15329 (March 16, 2004) ("EPA Exemption Decision").

The EPA issued its notice of intent to grant EDS's petition on November, 19, 2002, and the notice was published on December 20, 2002.  *See* Notice of Intent, 67 Fed. Reg. 77981 (Dec. 20, 2002).

After the notice of intent was issued, the EPA accepted public comment on the notice from December 6, 2002 until October 6, 2003.  EPA Exemption Decision, 69 Fed. Reg. at 15329.

The EPA also held public hearings on the notice of intent on January 8, 2003 and April 21, 2003.  *Id.*  Numerous comments were submitted on many issues.  EPA addressed these comments and prepared responses to them, which were published on EPA's website.  *See http://www.epa.gov/region5/water/uic/pubpdf/eds_rtc.pdf* (visited on December 26, 2005).

On March 16, 2004, EPA granted EDS's petition after determining that EDS met the requirements of 40 C.F.R. Part 148 Subpart C.  Specifically, EPA found that EDS demonstrated, to a reasonable degree of certainty, that there will be no migration of hazardous constituents from the injection zone for as long as the waste remains

7

hazardous, and that the hydrogeological and geochemical conditions at the site and the physiochemical nature of the waste stream(s) are such that reliable predictions can be made that the injected fluids will not migrate within 10,000 years (A) vertically upward out of the injection zone; or (B) laterally within the injection zone to a point of discharge or interface with an underground source of drinking water.  EPA Exemption Decision, 69 Fed. Reg. at 15329.

EPA thoroughly considered all the facts and issues underlying the exemption petition, including Sunoco's speculative brine extraction project.  *Id.* at 15336-15337. EPA made clear that it "reviewed and considered [Sunoco's] permit and comments on that permit, and . . . decided that issuance of such a permit should not bar granting of the exemption."  *Id.* at 15366.  EPA determined that "[b]ased on the evidence in the record, . . . neither the permit nor the drilling of such a well will affect EDS's demonstration."  *Id.*

EPA made "a reliable prediction that the proposed extraction well, if ever drilled, would not be drilled and operated in formations that form the injection zone of the EDS injection wells."  *Id.*

EPA noted that Sunoco's "description of its proposed use of the brine extracted from the Mt. Simon has been sketchy."  *Id.* at 15337.  Furthermore, EPA concluded that "injection by EDS would make [Sunoco's] brine extraction proposal impractical."  *Id.* EPA's conclusion was based, in part, on Sunoco's own comments "that injected hazardous waste would render the brine unsuitable for production; and extraction after EDS injects will require [Sunoco] to comply with expensive requirements under its State permit."  *Id.*  Thus, EPA found that if Sunoco insisted on withdrawal after EDS injected

wastes, a question would arise as to "whether any use would be viewed as legitimate or sham recycling." *Id.*

Due to these recycling and hazardous waste issues, EPA observed that even the State "indicated that [Sunoco] would be prohibited from pumping out because they would, in fact, be creating a situation where there was hazardous waste, that they would be a hazardous waste generator at that point in time, so they would probably be the entity that would be required to shut down." *Id.* Aside from the State's statements, EPA itself noted that if Sunoco "ever does extract, [EPA] might consider taking appropriate action to address such extraction." *Id.* Based on all of these reasons against Sunoco's possible extraction of brine from the Mt. Simon, EPA reviewed the then existing Sunoco permit and concluded that "[u]nder the current conditions, EDS's demonstration meets the criteria at 40 CFR 148.20." *Id.*

However, in order to ensure that EDS's Exemption would remain within the required legal boundaries, EPA retained and clarified the condition it had proposed in its Notice of Intent, terminating "the exemption if an extraction well is drilled within the [area of review] into the injection zone, penetrated by well #2-12 at a depth of 3,369 feet, and is used for extraction from any strata within the injection zone." *Id.* at 15337

EPA also included Condition 7, which continues the exemption grant "only while the underlying assumptions are valid." EPA Exemption Decision, 69 Fed. Reg. at 15342.

### E.  SUNOCO'S FIRST CHALLENGE TO EDS'S EXEMPTION

In response to EPA's issuance of the Exemption to EDS in March 2004, Sunoco filed a Petition For Review of the EPA Exemption, on June 10, 2004, in the Sixth Circuit Court of Appeals.  *Sunoco Partners Marketing & Terminals L.P. v. United States E.P.A., et al.,* No. 04-3771 (6th Cir. 2004)

Sunoco's Petition sought a "review of the [EPA's] final action granting an exemption from RCRA land disposal restrictions" to EDS.  (Exhibit D to EDS Brief).

In July 2004, EPA and Sunoco jointly moved the Sixth Circuit to hold the petition in abeyance, "without prejudice to the right of any party to move to reactivate the litigation at any time."  (Exhibit E to EDS Brief, Joint Motion of the Petitioner and Respondent to Hold Case in Abeyance, Case No. 04-3771).

Sunoco states as one of the bases for the Motion that "[t]he outcome of Sunoco's [appeal of the Michigan trial court decision to invalidate its brine extraction well permit] will have significant bearing on Sunoco's interest in challenging EPA's action."  (Exhibit E to EDS Brief, ¶ 4).  On October 4, 2004, the court granted the parties' Motion. (Exhibit F to EDS Brief, Sunoco Partners Marketing & Terminals L.P., Case No. 04-3771, Oct. 4, 2004 Order).  The Michigan Court of Appeals has since affirmed the lower court's decision in invalidating the permit.  *Environmental Disposal Sys., Inc. v Fitch*, Nos. 2566671, 256820, 2005 WL 2864240 (Mich. Ct. App. Nov. 1, 2005).

Ignoring this Sixth Circuit action, Sunoco filed its Complaint and Motion for Preliminary Injunction in this Court on December 14, 2005.  On December 27, 2005, Sunoco filed a Claim of Appeal in Wayne County Circuit Court challenging MDEQ's decision on December 27 to issue an Operating License to EDS under Part 111 of

NREPA.  (Exhibit 3 to EDS Proposed Findings of Fact and Conclusions of Law, *Sunoco Partners Marketing and Terminals, LP v. MDEQ*, No. 05-536662 (Wayne County)).

### F.   SUNOCO'S UNFULFILLED PLANS TO CONSTRUCT AN INCOMPATIBLE PROJECT

Sunoco currently conducts a liquid petroleum gas storage facility one-half mile from EDS's project.  (Sunoco Initial Br. at 1-2). While Sunoco's operation has included the injection of liquid petroleum gas into underground caverns, Sunoco has never before extracted brine from any underground formation, including the Mt. Simon formation.  (*Id.*).

Throughout EDS's entire State permitting process, from 1996 to 2001, Sunoco never objected to any of EDS's plans to construct deep wells and a hazardous waste facility.  (Wicklund Decl., ¶ 9).  Thus, EDS proceeded through years of permitting processes without any concerns lodged by Sunoco, despite the fact that it sat less than one-half mile from EDS.  To the contrary, Sunoco cooperated with EDS's efforts to install needed water lines.  (*Id.*).

Finally, in April 2001, after EDS had received its construction permits and began to build its facility, Sunoco first notified the MDEQ that it may want to expand its current activities and undertake a brine extraction project.  In a letter dated April 6, 2001, Sunoco advised MDEQ of its purported concerns regarding possible migration of wastes EDS would inject and "the potential contamination of [its] brine, which would render it unsuitable for use."  (Exhibit 4 to EDS Proposed Findings of Fact and Conclusions of Law, April 6, 2001, Correspondence from David R. Justin).  It was in this letter that Sunoco first apprised MDEQ of its "plan to develop a brine recovery well in the future . . . ."  (*Id.*).

11

In correspondence dated June 1, 2001, MDEQ responded to Sunoco's letter, stating it "was unaware that Sun[oco] was contemplating a brine extraction well." (Exhibit 1 to EDS Proposed Findings of Fact and Conclusions of Law).  MDEQ indicated that the brine Sunoco wished to extract "is not known to contain valuable or useful compounds and no use is made of it anywhere in the state."  (*Id.*).  On the other hand, MDEQ stated that "[i]n the Southern half of Michigan's Lower Peninsula, the Mt. Simon is the preferred formation for waste disposal and several disposal wells utilize it."  (*Id.* (emphasis added)).

MDEQ concluded that "[i]n the absence of any concrete information about subsurface conditions regarding other subsurface brine sources, or on the possibility that EDS injectate would reach the proposed brine extraction well, any action taken by the Supervisor of Mineral Wells to address [Sunoco's] concern would be both premature and ill-advised."  (*Id.*).

In the Summer of 2001, Sunoco also belatedly advised the EPA of Sunoco's plans for a  brine extraction project. During this time, the EPA was considering Sunoco's application for a UIC Permit to <u>inject</u> brine into the Mt. Simon formation.  When it learned of Sunoco's desire to extract brine as well, EPA responded, by letter dated July 18, 2001, that the Agency was "very surprised to learn last week that after you inject brine … you plan to withdraw that brine from the Mt. Simon Sandstone."  (Exhibit 5 to EDS Proposed Findings of Fact and Conclusions of Law, July 18, 2001, Correspondence From Valerie J. Jones).  The EPA observed that this extraction project was never disclosed as part of Sunoco's request for a brine injection permit.  (*Id.*).

Thus, not only was EDS caught off-guard by Sunoco's undisclosed plans to

construct a brine extraction well, but so was the MDEQ and EPA.

### G.  SUNOCO'S ATTEMPTS TO OBTAIN A BRINE EXTRACTION WELL PERMIT

Despite the above referenced concerns by MDEQ and EPA, on September 10, 2001, Sunoco filed an application with the MDEQ for a permit to construct a brine extraction well in the Mt. Simon Formation.  This application was filed despite the fact that this is the same formation that others had already been permitted to use to inject hazardous waste, *see* EAB UIC Opinion at 10, and it is a formation that has never before been used for brine extraction.  (Exhibit 1 to EDS Proposed Findings of Fact and Conclusions of Law).

Sunoco's extraction well permit was denied in January 2002 by the MDEQ Supervisor of Mineral Wells, who found that Sunoco's proposed project was incompatible with EDS's prior permitted use of the Mt. Simon formation.  (Exhibit 6 to EDS Proposed Findings of Fact and Conclusions of Law, January 11, 2002, Correspondence From Harold R. Fitch).  Specifically, the Supervisor factually determined that Sunoco's proposed drilling would cause "underground waste," as defined by Part 625, because it would compromise the Mt. Simon Formation.  (*Id.*).  The Supervisor found that this formation is a subsurface resource due to its "unique suitability as a repository for hazardous waste" -- which was EDS's and other entities' prior permitted use of the formation.  (*Id.*).  The Supervisor also determined that Sunoco's proposed well could cause Sunoco to produce and generate hazardous waste, in violation of Part 111. (Id)

In July 2002, the MDEQ Director upheld the Supervisor's decision and likewise concluded that Sunoco's proposed extraction project was incompatible with the existing

legal use of the Mt. Simon formation.  The Director found that "[t]he existence of the EDS permit means that the Supervisor must take notice of that activity in reviewing any proposal for use of the Formation in this general area.  Thus, the first issue is whether Sun[oco]'s proposed use of the Formation is compatible with the previously permitted use of EDS." (Exhibit A to EDS Brief).

The Director found that MDEQ, in properly considering EDS's prior permits, correctly recognized a legitimate threat that the proposed brine extraction well would produce hazardous waste in violation of Part 111, given its close proximity to EDS's hazardous waste facility.  (Id).  The Director also agreed with the Supervisor that the Mt. Simon formation's unique ability to accept hazardous fluids, which is the prior permitted use of the formation, made it a "subsurface resource" that must be protected by the Department.  (Id).

Sunoco appealed this decision to the Ingham County Circuit Court in July 2002. After the parties had extensively briefed their positions, MDEQ reversed course after a new State administration and a new MDEQ Director took office in January 2003. Subsequently, in the Spring of 2003, MDEQ and Sunoco engaged in a private negotiation to issue a permit to Sunoco, which resulted in MDEQ's complete reversal of position and issuance of a brine extraction well permit to Sunoco on May 29, 2003. That same day, EDS filed a Complaint with the Ingham County Circuit Court to overturn MDEQ's reversal.  (*Environmental Disposal Systems, Inc. v. Fitch*, Case No. 03-968-AZ, June 21, 2004 Opinion at 4 (Exhibit C to EDS Brief)).

The Circuit Court reviewed MDEQ's issuance of a brine extraction well permit to Sunoco, and reversed this decision as unlawful and arbitrary.  In its Opinion, the Court

found that the arguments presented by Sunoco and the State were "suspect" given the State's complete turnaround in granting the permit to Sunoco.  (*Id.* at 6).

The Court further acknowledged that "there have been changing priorities at the [M]DEQ."  (*Id.*).  The court stated "[n]aturally, with this type of political change, there may be differing attitudes about highly controversial issues such as the injection of hazardous waste into the substrata.  However, the manner in which the [M]DEQ changed its position and granted [Sunoco's] permit causes serious concern not only in this case, but in other situations where parties seeking permits may be unable to rely on those permits in the future."  (*Id.*).

Sunoco and the MDEQ sought leave to appeal this decision, which was granted, and on November 1, 2005, the Court of Appeals affirmed the Circuit Court decision to invalidate Sunoco's permit.  Motions for reconsideration filed by MDEQ and Sunoco were denied on January 3, 2006.  *Environmental Disposal Systems, Inc. v. Fitch*, Nos. 256671 and 256820 (Mich. Ct. App. Jan. 3, 2006).

Contrary to Sunoco's briefs and suggestions at oral argument, the Court of Appeals did not rule that EDS's project and Sunoco's proposed project were compatible under Michigan law.  Rather, the Court stated that the incompatibility of the projects was a factual issue beyond the scope of the limited review of agency decisions under Michigan law, and thus it ruled that the lower court should not have considered it. Therefore, the MDEQ's previous factual determinations (see paragraphs 47-49 above) that Sunoco's proposed project was inconsistent with EDS's project, are still valid.

The Administrative Rules applicable to Part 625 permit applications have since been amended to clarify the prohibition of a proposed operation that is incompatible with

15

an existing or permitted use. *See* Mich. Admin. R. 299.2341(2) (June 1, 2004). The Rule provides that "[a] well shall not be located or drilled to an objective formation which will result in operations incompatible with existing or permitted uses under this part or part 615. An applicant shall demonstrate its operations are not incompatible with those uses." Mich. Admin. Code R. 299.2341(2) (2004).

Therefore, Sunoco has no valid permits or licenses under Michigan law to construct and operate a brine extraction well in the Mt. Simon formation. Sunoco, however, asserts that it is in the process of obtaining another Part 625 Permit. (Sunoco Reply Br. at 4). As held by the Michigan Court of Appeals, Sunoco will also need a Part 111 construction permit and operating license.

## H. SUNOCO'S "SKETCHY" PROJECT CAN BE ACCOMPLISHED IN A SHALLOWER FORMATION

There is considerable evidence that the formation known as the Lockport Formation, which is 2000 feet shallower than the Mt. Simon formation, is in fact suitable for Sunoco's purported uses. In issuing the Exemption to EDS, the EPA concluded that formations other than Mt. Simon were suitable for Sunoco's purported brine project. In reaching its conclusions about the viability of the Lockport (or White Niagaran) formation for Sunoco's "sketchy" plans for brine extraction, EPA considered the results of an analysis EDS provided to EPA. EPA Exemption Decision, 69 Fed. Reg. at 15337.

EPA's review of the EDS analysis "indicate[d] that the Mt. Simon has a salt saturation of approximately 60% and the White Niagaran would be a better choice for balancing in salt caverns utilized for liquid petroleum gas (LPG) storage." *Id.*

In addition to EDS's analysis, EPA also noted that "[t]he plan submitted to the State on behalf of [Sunoco] for evaluating the Niagaran indicates that brine production is

possible from the White Niagaran . . . ."  *Id.*  Thus, the Mt. Simon is not the only

potential, available, or viable resource for Sunoco's desired brine injection/extraction

project.

These conclusions are consistent with those of the MDEQ.  In denying Sunoco's

initial brine extraction permit application, the Supervisor of Mineral Wells stated that

"[t]he DEQ believes that there are formations underlying Sun[oco]'s facility other than

the Mt. Simon that may meet [Sunoco's] requirements, and we are not aware of any

characteristics that make the Mt. Simon the only candidate for brine withdrawal."

(Exhibit 6 to EDS Proposed Findings of Fact and Conclusions of Law).

In addition, there is no evidence that Sunoco does not have other alternatives to

accomplish its expansion project, such as expanding its above-ground operations.

## II.    CONCLUSIONS OF LAW

### A.  SUNOCO IS ALSO NOT ENTITLED TO A PRELIMINARY INJUNCTION UNDER THE FOUR FACTOR TEST

Sunoco is not entitled to a preliminary injunction under the well-recognized four

factor test.  Under this analysis, the following factors must be balanced: 1) whether

Sunoco has shown a strong or substantial likelihood of success on the merits; 2)

whether Sunoco has demonstrated irreparable injury; 3) whether the issuance of a

preliminary injunction would cause substantial harm to others; and 4) whether the public

interest is served by the issuance of an injunction.  *Charter Twp. of Van Buren v.*

*Adamkus*, 965 F. Supp. 959, 963 (E.D. Mich. 1997) (citation omitted*); Capobianco v.*

*Summers*, 377 F.3d 559, 561 (6th Cir. 2004).

As discussed below, Sunoco cannot satisfy any of these factors.

### 1.    Sunoco Cannot Establish a Likelihood of Success on the Merits

Sunoco seeks review of EPA's decision under the Administrative Procedures Act ("APA"), 5 U.S.C. § 500, *et. seq.*   When reviewing an agency decision "[u]nder the APA, courts will not set aside a final agency action unless it is found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"   *Northeast Ohio Regional Sewer District v. United States E.P.A.*, 411 F.3d 726, 731 (6th Cir. 2005) (quoting 5 U.S.C. § 706(2)(A)); *see also*, EPA Memo at 25-26.

Thus, "[e]ven when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be discerned."   *Id.*  (internal quotations and citations omitted).  In deciding whether an agency decision is arbitrary and capricious, the court may consider whether:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given.

> *Id.*

Furthermore, "[a]lthough the court's review is to be 'searching and careful, the ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency.'"   *Id.*  This Court should also defer to the EPA's scientific and technical decisions.  *See Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 375-378 (1989).

Moreover, judicial review of an agency decision is confined to the record that was before the agency when it made its decision, not post-hoc submissions for purposes of

litigation.  See *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-744 (1985).

Under this limited standard of review, this Court does not stand in the shoes of the EPA and decide whether it agrees with EPA's decision.  Nor is this Court empowered to second-guess the Agency's technical or scientific evaluations or to consider post-decision documents or evidence submitted by Sunoco that did not exist at the time the EPA decision was made.  Rather, this Court must simply decide whether the EPA acted arbitrary, capriciously or abused its discretion based on the facts and evidence that existed at that time when it decided to issue the Exemption in March 2004.  Sunoco cannot satisfy this high standard.

Sunoco's sole challenge to the Exemption is the claim that the EPA should have anticipated that Sunoco would, at some point in the future, operate a brine extraction project in the Mt. Simon formation.   However, EPA reviewed and considered all the facts, including the then-existing Sunoco permit, and decided that "under the current conditions, EDS's demonstration meets the criteria at 40 CFR 148.20"  EPA Exemption Decision, 69 Fed. Reg. at 15337.  This conclusion was based on a review of Sunoco's brine extraction permit, the impracticability of Sunoco's project in conjunction with EDS's project, and the "sketchy" nature of Sunoco's "description of its proposed use of the brine . . . ."  *Id.*  Sunoco might disagree with this conclusion, but that is simply not enough to show that EPA acted arbitrarily.

Since the Exemption was issued Sunoco's legal position has only worsened. Sunoco's permit has been revoked by the Michigan courts.  Thus, under Michigan law Sunoco has no lawful right to construct or operate a brine extraction project in the Mt. Simon formation.  Thus, the EPA's conclusion that Sunoco's "proposed extraction well,

if ever drilled, would not be drilled and operated in formations that form the injection

zone of the EDS injection wells,"  EPA Exemption Decision, 69 Fed. Reg. at 15336, has

turned out to be entirely accurate.

Sunoco attempts to avoid all this by claiming that EPA's Exemption could be

invalid "if" Sunoco someday extracts brine from the Mt. Simon formation.  But it is simply

unknown, and thus entirely speculative, whether Sunoco will at some point in the future

extract brine from the Mt. Simon formation.  Sunoco's primary response to this fact is

that it will obtain the necessary permits from MDEQ or the EPA.  However, this

prediction of future events, when stripped to its core, simply means that Sunoco will

attempt to get the necessary permits, and it hopes that these attempts are successful.

However, as Sunoco itself acknowledges in its Reply Brief to EDS's Brief in Opposition,

when a company engages in this complex permitting process, "there [is] no guarantee

that all of the needed permissions would be obtained - - or would be sustained if

challenged."  (Sunoco Reply Br. at 3).  Sunoco learned this first-hand when its first

application for a brine extraction well permit was denied.  And, when Sunoco was able

to obtain a permit after MDEQ reversed course, that permit was invalidated by the

Michigan Court system.  Now Sunoco indicates it is making a third attempt to obtain a

Part 625 permit.  (Sunoco Reply Br. at 4).  But its attempts to obtain a Part 625 permit

will be unsuccessful and its attempts to obtain a Part 111 construction permit and

operating license will take years, with the final outcome wholly unknown.

### a.  Sunoco Cannot Obtain a Part 625 Permit Under Michigan Law

Sunoco's third attempt to obtain a Part 625 permit will prove futile.  Under the

current MDEQ Part 625 Rules, "[a] well shall not be located or drilled to an objective

formation which will result in operations incompatible with existing or permitted uses under this part or part 615.  An applicant shall demonstrate its operations are not incompatible with those uses."  Mich. Admin. Code R. 299.2341(2) (2004).  This is a new Administrative Rule, promulgated by MDEQ on June 1, 2004, to clarify the prohibition against the very type of dispute that has arisen here, where a party comes to MDEQ and tries to obtain a Part 625 construction permit for a proposed operation that would be incompatible with an existing or permitted project.

Under this new Administrative Rule, Sunoco will not be able to show that its operation is compatible with EDS's prior permitted and existing facility.  As the Environmental Appeals Board concluded in its review of Sunoco's challenge to EDS's UIC permit, Sunoco's and EDS's potential uses of the Mt. Simon formation "are, at bottom, profoundly incompatible with each other, and 'there's the rub.'"  EAB UIC Opinion at 10.  This is the same conclusion reached by the MDEQ Director and Supervisor of Mineral Wells.  (Exhibit 6 to EDS Proposed Findings of Fact and Conclusions of Law; Exhibit A to EDS Brief).

Sunoco concedes that its proposed project is incompatible with EDS's prior permitted project; otherwise, it would not be before this Court asking that EDS's project be terminated.  Indeed, under the new MDEQ Administrative Rule, in order to obtain a Part 625 permit Sunoco will have to prove exactly the opposite of what it seeks to prove in this challenge to the Exemption.  Sunoco claims here that EDS's injection of hazardous waste into the Mt. Simon formation will adversely affect Sunoco's proposed brine extraction project because, if that planned project ever becomes a reality, it could cause hazardous waste to migrate.   If Sunoco is correct in this argument, it cannot

obtain a Part 625 permit, because under Rule 299.2341(2) its project would be incompatible with EDS's prior permitted and existing project.

This inability to obtain a Part 625 permit further supports EPA's determination in March 2004 that Sunoco's "proposed extraction well, if ever drilled, would not be drilled and operated in formations that form the injection zone of the EDS injection wells."  EPA Exemption Decision, 69 Fed. Reg. at 15336.  This decision is entirely correct, and certainly not arbitrary or capricious.  Sunoco thus cannot demonstrate a likelihood of success on the merits of its claims.

### b. Sunoco's Obligation Under Michigan Law To Obtain A Part 111 Construction Permit and Operating License, Even If Successful, Could Take Years

Even if Sunoco were somehow able to meet the compatibility requirement of Rule 299.2341(2) and obtain a Part 625 construction permit, under the Michigan Court of Appeals' decision invaliding its Part 625 permit, Sunoco must also obtain a Michigan hazardous waste construction permit and operating license under Part 111 of NREPA before operating any brine extraction operation in the Mt. Simon formation.  *Fitch*, 2005 WL 2864240 at *8 (citing M.C.L. § 324.11118 (construction permit requirement) and M.C.L. § 324.11123(1) (operating license requirement)).

EDS plans to inject hazardous waste into the Mt. Simon formation where it will be safely contained.  Under the "contained in" principle—which states that environmental media that "contains" hazardous waste is itself hazardous waste—formation fluids containing hazardous waste must be managed as a hazardous waste if it is pumped from the ground or actively managed in any way.  Mich. Admin. Code Rule 299.9203(3) ("a hazardous waste will remain a hazardous waste"); *Chemical Waste Management,*

*Inc. v. United States E.P.A.*, 869 F.2d 1526, 1531 (D.C. Cir. 1989). Therefore, as the Michigan Court of Appeals properly determined when it invalidated Sunoco's permit, Sunoco would itself have to obtain all the necessary Part 111 hazardous waste permits, construct its facilities to meet hazardous waste facility requirements, and otherwise comply with all of the voluminous hazardous waste treatment, storage and disposal requirements found in State[2] and federal law.

Sunoco's counsel's suggestion at oral arguments that this process could be accomplished "in a short period of time" is unreliable. Under Part 111 and its implementing Rules, the process could very likely take years to accomplish, with no guarantee that a permit and license would be issued at the end of the process.

To initiate the permitting process, Sunoco would first have to obtain a construction permit from the MDEQ. M.C.L. § 324.11118 and Mich. Admin. Code R. 299.9501. Among other legal requirements, this entails: (1) Sunoco giving at least 30 days public notice and holding a pre-application meeting for the public before the construction permit application may be submitted, R. 299.9511; (2) Sunoco submitting a complex construction permit application, *see generally* R. 299.9504, including: (i) the information required at 40 C.F.R. § 270.13 (including a specification of all of the hazardous wastes that will be treated, stored or disposed at the facility) and § 270.14 (*e.g.,* an emergency contingency plan, descriptions of training programs to be implemented, a facility closure plan, closure cost estimates, etc.); (ii) a hydrogeological report (including, among other things, an identification of any aquifer utilized by the

_____

[2] Michigan's hazardous waste law starts at M.C.L. § 324.11101. The State's regulations, totaling over 250 pages of requirements, begin at Michigan Administrative Code Rule 299.9101. Michigan's regulations also incorporate by reference numerous federal regulatory requirements, which begin at 40 C.F.R. § 260.1.

public within 2,000 feet, proposed locations of groundwater monitoring wells, soil boring logs showing soil and groundwater conditions on site, and a detection monitoring program), *see* R. 299.9506; (iii) an environmental assessment, including a failure mode assessment; (iv) engineering plans for process equipment and containment structures; and (v) certified professional engineering assessments describing how the proposed waste management equipment and systems will meet legal requirements. *See, e.g.,* 40 C.F.R. § 270.16 (requirements for tank systems).

After the application is submitted, MDEQ must determine whether it has a complete application. There is often a back-and-forth process between an applicant and the MDEQ before an application is finally determined to be complete. This process alone can take a considerable amount of time. Once MDEQ has finally determined that it has received a complete application, the MDEQ must notify the municipality and county; each division within the MDEQ with responsibility for land, air or water management; and other appropriate agencies. M.C.L. § 324.11119(1)(a). A written and signed review from each responsible MDEQ division must be received and recorded before the process may proceed. M.C.L. § 324.11119(1)(b).

Within 120 days from receiving the complete application, the MDEQ must either deny the application or convene a Site Review Board and refer the application to that Board for review and approval. M.C.L. § 324.11119(1)(b) and (2) and § 324.11120.

If acceptable, the MDEQ must then prepare a draft construction permit and allow forty-five days public notice, followed by the preparation of a written response to the public comments received.  R. 299.9511(7).  *See also* M.C.L. § 324.11119.[3]

If Sunoco is able to obtain a construction permit, then it must construct the waste management equipment and systems before it can apply for an operating license. Only after receiving an engineer's certification that the facilities were properly constructed pursuant to the approved designs and engineering specifications contained in the construction permit will the MDEQ consider issuing an operating license.  M.C.L. § 324.11123(3).   And, once again, this application process is subject to review, approval

---

[3]  Although Part 111 contains an exemption from the construction permit requirement for "limited storage facilities," M.C.L. § 324.11122, the exemption does not apply to Sunoco.  First, Sunoco's proposed facility would not meet the definition of "limited storage," which limits storage to less than 25,000 gallons in "tanks or containers."  M.C.L. § 324.11103(7).  (*See* Sunoco Initial Br., Exhibit 2, Van Wagnen Aff., Exhibit 2).   Further, limited storage facilities are prohibited from receiving hazardous wastes from other treatment, storage, or disposal facilities.  M.C.L. § 324.11103(7)(e).  Sunoco would in fact, however, be receiving wastes from EDS's disposal facility.  Finally, the exemption does not apply to any *disposal* activities; to the contrary, disposal always requires a construction permit under Part 111.  Sunoco contemplated pumping hazardous brine from the Mt. Simon formation and discharging the brine into other underground formations as a means of displacing liquid petroleum gas.  This activity clearly meets the definition of "disposal": "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any hazardous waste into or on land or water in such a manner that the hazardous waste or a constituent of the hazardous waste might enter the environment, be emitted into the air, or discharged into water, including groundwater."  Mich. Admin. Code R 299.9102(bb).  In any event, even if the exemption were to apply, Sunoco would still have to build its storage facility according to plans approved by the MDEQ and then obtain an operating license, which would take significant time.   *See* M.C.L.§ 324.11122(1) and (6).

25

and public comment requirements, adding additional months or years to the process. *See* R. 299.9508 and 299.9510.[4]

This entire process can be very lengthy.  In fact, it took EDS over five years to obtain its Part 111 permit and operating license (as well as its Part 625 permit).  Sunoco itself acknowledges the speculative nature of this process, stating (in relation to EDS's project) "there [is] no guarantee that all of the needed permissions would be obtained - - or would be sustained if challenged."  (Sunoco Reply Br. at 3).

This burdensome regulatory process that now confronts Sunoco is the reason why EPA recognized in its Exemption decision that any attempt by Sunoco to extract brine from the same formation as EDS would be so costly and raise so many regulatory complexities that a question would arise as to whether Sunoco's proposed activities would be "legitimate or sham recycling."  *See* 69 Fed. Reg. at 15337 (discussing at length the impracticability of Sunoco's project).  EPA also observed that "the extraction of brine from the Mt. Simon formation following injection of hazardous waste by EDS would engender significant regulatory complexities, which might bar [Sunoco's] intended use of the brine."  EPA Exemption Decision, 69 Fed. Reg. at 15337.  The foregoing insurmountable and lengthy regulatory complexities now facing Sunoco confirm, yet again, that the EPA properly exercised its discretion in issuing the Exemption.

In the end, even if Sunoco were able to obtain the necessary construction permit and operating license, which is highly doubtful, the entire process would likely take a number of years.  There is no justification for delaying EDS's fully permitted project at

---

[4]  Although R. 299.9510(6) requires the MDEQ to make a final decision within 140 days of receiving a complete operating license application, public participation requirements can (and often do) extend this period. R. 299.9510(7).

all, much less years, so that Sunoco can start the process that EDS started over five years ago and just recently completed.

Therefore, the speculative and impracticable nature of Sunoco's purported project further supports EPA's decision that Sunoco is unlikely to ever operate a brine extraction project in the Mt. Simon formation.  Thus, Sunoco cannot show a likelihood of success on the merits of its claims that EPA acted arbitrarily or capriciously in issuing the Exemption.

### 2.  Sunoco Cannot Demonstrate Any Irreparable Injury

Because injunctive relief "is an 'extraordinary remedy,' a court will not invoke its injunctive powers unless the movant has met its burden of proof regarding irreparable harm." *McDonald's Corp. v. Burger King Corp.,* 87 F. Supp. 2d 722, 725 (E.D. Mich. 1999).  An irreparable injury is an injury that "cannot be undone through monetary remedies." *Performance Unlimited, Inc. v. Questar Publishers, Inc.,* 52 F.3d 1373, 1382 (6th Cir. 1995).  As a general rule, "a preliminary injunction is an inappropriate remedy where the potential harm to the movant is strictly financial." *Id.* (citation omitted).  The potential harm "must be 'actual and imminent,' and not merely remote or speculative." *Fox v. Massey-Ferguson, Inc.,* 172 F.R.D. 653, 680 (E.D. Mich. 1995); *aff'd* 91 F.3d 143 (6th Cir. 1996); *Center for Biological Diversity v. Lueckel*, 248 F. Supp. 2d 660, 669 (W.D. Mich. 2002) ("[t]o justify injunctive relief, there must be a 'substantial threat of impending injury'"), *aff'd* 417 F.3d 532 (6th Cir. 2005), *McDonald's*, 87 F. Supp. 2d at 725 ("[a]ny claimed irreparable harm must be 'imminent,' . . . with a 'substantial threat of impending injury'").  Sunoco fails to meet this heavy burden.

Sunoco's claimed irreparable harm again brings to light the speculative nature of its claims in this case.  Sunoco has no legal right or interest under Michigan law to

engage in its desired extraction project.  Nor does Sunoco have any right or property interest in the so-called "uncontaminated brine" that lies in the Mt. Simon formation. Sunoco ignores these facts and attempts to argue it might suffer irreparable harm based solely on the possibility that someday it  may obtain the appropriate permits, construct its facility, and engage in such a project.  This, of course, is shear speculation.

As Sunoco states, "[i]t is not possible now to know for sure the extent to which hazardous wastes EDS would inject would affect the brines [Sunoco] would extract." (Sunoco's Br. at 29).  Sunoco goes on to state that the wastes EDS will inject "could, however, make it impossible to use the brines for [Sunoco's] cavern expansion project, and thus make that project not possible."  (*Id.*)

To the extent Sunoco's theoretical irreparable harm argument is based on its desired, but yet unrealized and non-permitted brine extraction project, it fails because it is speculative and remote, rather than actual and imminent, as required for the issuance of a preliminary injunction.  *Fox*, 172 F.R.D. at  680; *Lueckel*, 248 F. Supp. 2d at 669; *McDonald's*, 87 F. Supp. 2d at 725.

Sunoco also argues that it will be irreparably injured because EDS's project could impose "substantial costs on [Sunoco's] project . . . ," (Sunoco's Br. at 29).  Sunoco never quantifies what these "substantial costs" are, but it makes no difference.  This is solely a financial injury  that makes "a preliminary injunction an inappropriate remedy . . . ." because it is compensable via money damages.  *Performance Unlimited*, 52 F.3d at 1382.  Because Sunoco's irreparable harm arguments are either financially based or purely speculative, Sunoco fails to meet its burden on this essential prong of the preliminary injunction analysis.

28

In fact, Sunoco's tortured irreparable injury argument reveals that Sunoco cannot show both irreparable injury and a likelihood of success on the merits. This is so because, if Sunoco is correct and EDS's injection of wastes will make the proposed brine extraction project impossible, then EPA was entirely correct in concluding with "a reasonable degree of certainty that [Sunoco] will not extract if EDS injects hazardous waste." EPA Exemption Decision, 69 Fed. Reg. at 15337. Sunoco would thus not be able to show a likelihood of success on the merits of its claims that EPA was incorrect in concluding that Sunoco's project would never be a reality. If, on the other hand, Sunoco's concurrent argument is to be believed, that it may be able to operate its facility but at an increased cost, then Sunoco cannot show irreparable injury because its alleged injury is compensable by money damages.

### 3.    A Preliminary Injunction Would Cause Substantial Harm To Others, Namely EDS And Its Customers

While the harm Sunoco complains of is speculative and impossible to determine, the issuance of an injunction would harm EDS in an actual, imminent, and irreparable manner. Furthermore, there is evidence in the record that Sunoco can use other formations for its project, whereas, EDS's project may fail if it cannot use the Mt. Simon formation. EPA Exemption Decision, 69 Fed. Reg. at 15336-15337; (Wicklund Decl., ¶ 14-19).

Courts in this Circuit have denied injunctive relief where the harm to others would be substantial. *See, e.g., Keweenaw Bay Indian Community v. United States*, 1999 U.S. Dist. Lexis 15122 (W.D. Mich. Sept. 30, 1999) (unpublished) (injunction denied where it would have resulted in harm to others and to public via employee lay-offs and significant lost community revenue); *The Shane Group, Inc. v. BCI Burke Co.*, 1:02-CV-

58, 2002 WL 32059737 (W.D. Mich. Aug. 12, 2002) (unpublished) (denied injunction where it would have prohibited the defendant from competing in any way).

Likewise, the Sixth Circuit has held that "the loss of [a] business [] is precisely the type of harm which necessitates the granting of preliminary injunctive relief . . . ." *Performance Unlimited*, 52 F.3d at 1382; *Warren v City of Athens, Ohio*, 411 F.3d 697, 711-712 (6th Cir. 2005) (holding "[s]uch financial ruin qualifies as irreparable harm"); *Central Transp., Inc. v. Central States, Southeast and Southwest Areas Pension Fund, et al.*, 639 F. Supp. 788, 791-92 (E.D. Tenn. 1986) (holding "[d]estruction of the plaintiffs as going concerns is irreparable damage").

Sunoco never claims that its entire business would be jeopardized if the Exemption is upheld.  To the contrary, Sunoco touts the fact that it has been in business for many years, without any capability or authorization to extract brine from the Mt. Simon formation.  The most that Sunoco can claim is that if the Exemption is not enjoined it will be inconvenienced by increased costs for its proposed extraction well. On the other hand, if the Exemption is enjoined, the uncontroverted evidence shows that EDS's entire project may very well fold.

EDS has spent years and $40,000,000 constructing its facilities and obtaining all of the necessary permits.  (Wicklund Decl., ¶ 11).  EDS's facility is now operating, and an injunction would cause it to breach pending customer commitments, and irretrievably lose industry good will. Most significantly, it will likely cause its primary investor, the Police & Fire, to pull out of the project, and the facility would be shut down.  This would result in the loss of the $40,000,000 business and the lay-off of EDS's employees and contractors.

30

**4.     The Public Interest Will Be Harmed By Issuance Of A Preliminary Injunction**

Given that EDS's facility will safely dispose of the hazardous wastes already present in our environment, a preliminary injunction, which will likely kill EDS's project, certainly does not advance the public interest.  The facility has already passed every applicable safety and technical requirement imposed by EPA and MDEQ.  As EPA found in its decision, "EDS's proposed injection is protective of human health and the environment."  EPA Exemption Decision, 69 Fed. Reg. at 15329.  MDEQ found that the Mt. Simon is suited for disposal and not useful for a brine extraction project.  (Exhibit 2 to EDS Proposed Findings of Fact and Conclusions of Law).

While there will always be those who will oppose waste facilities in their community, as this Court recognized in *Adamkus*, "if the nation is ever to manage its problems with hazardous and toxic substances, public interest cannot be determined simply by a community which would prefer that the wastes in question be disposed of elsewhere."  *Adamkus*, 965 F. Supp. at 970.  Unlike *Adamkus*, where the suit was filed by the local municipality, this suit was filed by a private business concern that is merely attempting to use the  Mt. Simon formation for its own private business purposes.  Thus, Sunoco is not seeking to maintain the "pristine" nature of the brine in the Mt. Simon formation out of some environmental concern, as it claimed in its Brief. (Response to EPA Motion to Dismiss, p. 3).  Rather, Sunoco simply wants to use that brine for its own commercial purposes.  This wholly private interest, which is not authorized or permitted under State law, cannot defeat the public interest in EDS's lawfully permitted, constructed and operating facility.

31

The public interest would also be harmed if a company like Sunoco is allowed to come in at the eleventh hour and challenge a project that is fully permitted, fully constructed and has even begun operations.  In order for this State to attract and keep businesses, particularly in this difficult economic climate, it must not only ensure that federal and state statutory and regulatory guidelines are followed, but also that once those guidelines are satisfied an entity can in fact begin to operate.  A company like EDS, which has played by the rules for over ten years, gone through a number of permitting processes, done everything asked of it by every applicable governmental entity, and in the process has expended approximately $40,000,000, must be allowed now to do business.  Otherwise, EDS and other small and medium sized businesses (which employ the majority of Michigan citizens) will have no confidence they will get treated fairly in Michigan if they do what is asked of them.

### III.  CONCLUSION

For the following reasons, this Court ORDERS that:

Sunoco's Motion for Preliminary Injunction be DENIED;

EDS shall receive payment of the $100,000.00 surety bond obtained by Sunoco pursuant to the Temporary Restraining Order; and

This Court's Temporary Restraining Order in this Matter be VACATED.


s/Nancy G. Edmunds_____
Nancy G. Edmunds
United States District Judge

Dated:  January 20, 2006

32

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 20, 2006, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager